IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| ROOSEVELT BRADLEY,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>HOUSER SHOES, INC.,<br><br>　　　　　　Defendant. | Civil Action No. 2:24-cv-184<br><br>COMPLAINT FOR DECLARATORY AND PROSPECTIVE INJUNCTIVE RELIEF |

**COMPLAINT FOR DECLARATORY AND PROSPECTIVE INJUNCTIVE RELIEF**

　　　　ROOSEVELT BRADLEY ("Plaintiff"), by and through undersigned counsel, seeks a permanent injunction requiring a change in HOUSER SHOES, INC.'s ("Houser Shoes" or "Defendant") corporate policies to cause its digital properties to become, and remain, accessible to individuals with visual disabilities. In support thereof, Plaintiff respectfully asserts as follows:

**INTRODUCTION**

　　　　1.　　This action arises from Defendant's failure to make its digital properties accessible to legally blind individuals, which violates the effective communication and equal access requirements of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181-12189.

　　　　2.　　It is estimated that 2.3 percent of the American population lives with some sort of visual disability. *See* Erickson, W., Lee, C., von Schrader, S., Disability Statistics from the American Community Survey (ACS). Ithaca, NY: Cornell University Yang-Tan Institute (YTI), *available at* https://www.disabilitystatistics.org/acs/1 (last accessed May 28, 2024).

　　　　3.　　For this significant portion of Americans, accessing digital platforms, mobile applications, and other information via their computers and smartphones has become critical,

especially in the post-pandemic era. Since the pandemic, U.S. e-commerce has continued to grow, with 12 million new users choosing to shop online since 2020.[1] According to a recent study, e-commerce increased by 25% from $516 billion (11.1% of total retail sales) to $644 billion (14.2% of total retail sales).[2] This underscores the importance of access to online retailers.

4. During these challenging times, disabled individuals rely heavily on acquiring goods and services from the internet. With more businesses choosing to market their goods and services on their online platform, access to the website is vital. Sir Tim Berners-Lee, the founder of the World Wide Web, wrote, "The power of WWW is in its universality. Access by everyone regardless of disability is an essential aspect."[3]

5. At the same time, the share of Americans who own smartphones has climbed from just 35% in 2011 to 81% in 2019—amounting to more than 265 million people in the United States. *See* U.S. Census Bureau, U.S and World Population Clock, *available at* https://www.census.gov/popclock/ (last accessed May 28, 2024) (U.S. population on June 12, 2019 was 325.4 million).

6. In this climate, it is especially important to consider factors that can facilitate or impede technology adoption and use by people with disabilities. National Council on Disability, *National Disability Policy: A Progress Report* (Oct. 7, 2016), *available at*

---

[1] *See* Statista, Number of users of e-commerce in the U.S. 2018-2027, available at https://www.statista.com/statistics/273957/number-of-digital-buyers-in-the-united-states/ (last accessed May 28, 2024).
[2] *See* National Library of Medicine, *Online shopping continuance after COVID-19, available at https*://www.ncbi.nlm.nih.gov/pmc/articles/PMC9379614/ (last accessed May 28, 2024).
[3] *See* Forbes, *Covid Reminds Us That Web Accessibility Helps All Users, Not Just The Disabled, available at* https://www.forbes.com/sites/gusalexiou/2020/08/23/covid-reminds-us-that-web-accessibility-helps-all-users-not-just-the-disabled/?sh=6b67ed7a6df1 (last accessed May 28, 2024).

https://ncd.gov/sites/default/files/NCD_ProgressReport_ES_508.pdf (last accessed May 28, 2024).

7.  When it is properly formatted, digital content is universally accessible to everyone. But when it is not, ineffective communication results. In those situations, legally blind individuals must unnecessarily expend additional time and effort to overcome communication barriers sighted users do not confront. These barriers may require the assistance of third parties or, in some cases, may deny outright access to the online service. *See* Kasey Wehrum, Inc., *Your Digital Platform is Scaring Customers Away. 5 Easy Ways to Fix It* (Jan. 2014), *available at* https://www.inc.com/magazine/201312/kasey-wehrum/how-to-get-online-customers-to-complete-purchase.html (last accessed May 28, 2024).

8.  Screen access "software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user." *Andrews v. Blick Art Materials, LLC*, 17-CV-767, 2017 WL 6542466, at *6 (E.D.N.Y. Dec. 21, 2017) (J. Weinstein).

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use digital platforms. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring his to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.
>
> The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable."…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a digital platform by listening and responding with his keyboard.

*Id.* at *6-7.[4]

---

[4]  *See* American Foundation for the Blind, *Screen Readers*, *available at*

9. Unfortunately, Defendant fails to communicate effectively with Plaintiff because its digital properties are not properly formatted to allow legally blind users such as Plaintiff to access its digital content. Accordingly, legally blind customers such as Plaintiff are deprived from accessing information about Defendant's products and using its online services, all of which are readily available to sighted customers.

10. The United States Department of Justice Civil Rights Division has provided "Guidance on Web Accessibility and the ADA."[5] It states in part, "the Department has consistently taken the position that the ADA's requirements apply to all the goods, services, privileges, or activities offered by public accommodations, including those offered on the web."

11. This lawsuit is aimed at providing legally blind users like Mr. Bradley a full and equal experience.

## PARTIES

12. Plaintiff Bradley is, and at all times relevant hereto has been, legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*. Plaintiff has been totally blind since he was nine years old due to a tumor on his optic nerve. Plaintiff uses an iPhone 12 to navigate the internet, as well as a Windows personal computer with the JAWS screen-reading application and a Mac computer with Voiceover. Plaintiff is, and at all times relevant hereto has been, a resident of Crown Point, Indiana.

///

---

https://www.afb.org/node/16207/screen-readers (last accessed May 28, 2024) (discussing screen readers and how they work).
[5] See ADA.Gov, *Guidance on Web Accessibility and the ADA*, *available at* https://www.ada.gov/resources/web-guidance/ (last accessed May 28, 2024) ("DOJ Guidance").

13. Defendant is a North Carolina corporation with its principal place of business located at 5418 Asheville Highway, Hendersonville, North Carolina 28791. Defendant is a leader in the sale and distribution of shoes, clothing, bags, and other related products under its recognized brand name Houser Shoes.

14. Consumers may purchase Defendant's products and access other brand-related content and services at https://housershoes.com/ ("Digital Platform"), the Digital Platform Defendant owns, operates, and controls.

15. In addition to researching and purchasing Defendant's products and services from the comfort and convenience of their homes, consumers may also use Defendant's Digital Platform to contact customer service by phone and email, sign up to receive product updates, product news, and special promotions, review important legal notices like Defendant's Privacy Policy, and more.[6]

16. Defendant is responsible for the policies, practices, and procedures concerning the Digital Platform's development and maintenance.

17. Because Defendant's Digital Platform is not and has never been fully accessible, and because upon information and belief Defendant does not have, and has never had, adequate corporate policies that are reasonably calculated to cause its digital properties to become and remain accessible, Plaintiff invokes 42 U.S.C. § 12188(a)(2) and seeks prospective injunctive relief requiring Defendant to:

   a) Retain a qualified consultant acceptable to Plaintiff ("Web Accessibility Consultant") who shall assist in improving the accessibility of its Digital Platform, including all third-party content and plug-ins, so the goods and services on the Digital Platform may be equally accessed and enjoyed by individuals with vision related disabilities;

   b) Work with the Web Accessibility Consultant to ensure all employees involved in Digital Platform and content development be given web accessibility training on a

---

[6] *See, e.g.*, Defendant's Home Page, *available at* https://housershoes.com/.

biennial basis, including onsite training to create accessible content at the design and development stages;

c) Work with the Web Accessibility Consultant to perform an automated accessibility audit on a periodic basis to evaluate whether Defendant's Digital Platform may be equally accessed and enjoyed by individuals with vision related disabilities on an ongoing basis;

d) Work with the Web Accessibility Consultant to perform end-user accessibility/usability testing on at least a quarterly basis with said testing to be performed by humans who are blind or have low vision, or who have training and experience in the manner in which persons who are blind use a screen reader to navigate, browse, and conduct business on Digital Platforms, in addition to the testing, if applicable, that is performed using semi-automated tools;

e) Incorporate all of the Web Accessibility Consultant's recommendations within sixty (60) days of receiving the recommendations;

f) Work with the Web Accessibility Consultant to create a Web Accessibility Policy that will be posted on its Digital Platform, along with an e-mail address, instant messenger, and toll-free phone number to report accessibility-related problems;

g) Directly link from the footer on each page of its Digital Platform, a statement that indicates that Defendant is making efforts to maintain and increase the accessibility of its Digital Platform to ensure that persons with disabilities have full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the Defendant through the Digital Platform;

h) Accompany the public policy statement with an accessible means of submitting accessibility questions and problems, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

i) Provide a notice, prominently and directly linked from the footer on each page of its Digital Platform, soliciting feedback from visitors to the Digital Platform on how the accessibility of the Digital Platform can be improved. The link shall provide a method to provide feedback, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

j) Provide a copy of the Web Accessibility Policy to all web content personnel, contractors responsible for web content, and Client Service Operations call center agents ("CSO Personnel") for the Digital Platform;

k) Train no fewer than three of its CSO Personnel to automatically escalate calls from users with disabilities who encounter difficulties using the Digital Platform. Defendant shall have trained no fewer than 3 of its CSO personnel to timely assist such users with disabilities within CSO published hours of operation. Defendant

shall establish procedures for promptly directing requests for assistance to such personnel including notifying the public that customer assistance is available to users with disabilities and describing the process to obtain that assistance;

l) Modify existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Digital Platform to be inaccessible to users of screen reader technology;

m) Plaintiff, his counsel, and their experts monitor the Digital Platform for up to two years after the Mutually Agreed Upon Consultant validates the Digital Platform is free of accessibility errors/violations to ensure Defendant has adopted and implemented adequate accessibility policies. To this end, Plaintiff, through his counsel and their experts, shall be entitled to consult with the Web Accessibility Consultant at their discretion, and to review any written material, including but not limited to any recommendations the Digital Platform Accessibility Consultant provides Defendant.

18. Digital platforms have features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible digital platform will not cause the digital platform to remain accessible without a corresponding change in corporate policies related to those web-based technologies. To evaluate whether an inaccessible digital platform has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful manner that will cause the digital platform to remain accessible, the digital platform must be reviewed on a periodic basis using both automated accessibility screening tools and end user testing by disabled individuals.

## **JURISDICTION AND VENUE**

19. The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

20. Defendant participates in the State's economic life by performing business over the Internet. Through its Digital Platform, Defendant entered into contracts for the sale of its products and services with residents of Indiana. These online sales contracts involve, and indeed require, Defendant's knowing and repeated transmission of computer files over the Internet. *See Hetz v.*

*Aurora Med. Ctr. of Manitowoc Cnty.,* No. 06-C-636, 2007 U.S. Dist. LEXIS 44115, at *6 (E.D. Wis. June 18, 2007).

21. Plaintiff was injured when he attempted to access Defendant's Digital Platform from his home in this District in an effort to shop for Defendant's products but encountered barriers that denied him full and equal access to Defendant's online goods, content, and services. Plaintiff attempted to purchase the "Skechers Men's Slip-Ins" but unfortunately he was unable to complete his purchase due to the accessibility barriers that exist on Defendant's Digital Platform.

22. Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Plaintiff's claim occurred.

## FACTS APPLICABLE TO ALL CLAIMS

23. While the increasing pervasiveness of digital information presents an unprecedented opportunity to increase access to goods, content, and services for people with perceptual or motor disabilities, digital platform developers and web content developers often implement digital technologies without regard to whether those technologies can be accessed by individuals with disabilities. This is notwithstanding the fact that accessible technology is both readily available and cost effective.

## DEFENDANT'S ONLINE CONTENT

24. Defendant's Digital Platform allows consumers to research and participate in Defendant's services and products from the comfort and convenience of their own homes.

25. The Digital Platform also enables consumers to contact customer service by phone and email, sign up to receive product updates, product news, and special promotions, review important legal notices like Defendant's Privacy Policy, and more.

8

**HARM TO PLAINTIFF**

26.　Plaintiff attempted to access the Digital Platform from his home in Crown Point, Indiana to purchase Skechers shoes. Unfortunately, because of Defendant's failure to build the Digital Platform in a manner that is compatible with screen access programs, Plaintiff is unable to understand, and thus is denied the benefit of, much of the content and services he wishes to access on the Digital Platform. The following are illustrative (but, importantly, not exhaustive) examples of a few of the accessibility barriers observed on the Digital Platform:

　　a.　When the homepage first loads, a promotional popup is displayed. First, the screen-reader focus arrives on and announces the "Close (X)" button. If a user selects this button, an announcement of "close dialogue 1" is made and the popup closes. However, once the screen-reader attempts to continue navigating through the page, they are unable to do so, and announcements of "close dialogue 1" are continuously made. The result impedes the screen-reader user's ability to successfully navigate and comprehend Defendant's Digital Platform.



      b.      The homepage of Defendant's Digital Platform contains several product carousels such as "New Arrivals" and "Best Sellers." When the screen-reader focus arrives on either of these carousels, the products are announced to the screen-reader user. However, screen-reader users are unable to select the products in the carousel. When a sighted user selects a product from the carousel, the product page loads. This is not the case for screen-reader users. Furthermore, there are several sections in the footer of the page that require the user to click on the '+' button to expand the section. When a screen-reader user expands the section, the screen-reader focus skips over that section and only the title is announced. Additionally, shoppers can use the "Filter" and "Sort By" buttons to filter through the products. However, these buttons do not receive the screen-reader focus and are not announced to the screen-reader user. Lastly, the "Size," "Color," and "Add to Cart" sections on the product pages do not receive the screen-reader focus and are not announced to the screen-reader user.





      c.      The "Main Menu" on Defendant's Digital Platform is not accessible to screen-reader users. For example, when a page first loads, the menu is displayed in a closed state which the user must expand by selecting the button. Once expanded, several submenu links are displayed. However, when the screen-reader focus arrives on the "Main Menu" button, it is announced as "chopsticks." If the screen-reader user manages to select the button to expand the

11

menu, the submenu links do not receive the screen-reader focus and are not announced to the screen-reader user. The result prevents the screen-reader user from accessing the main menu links.



27. These barriers, and others, deny Plaintiff full and equal access to all of the services the Digital Platform offers, and now deter him from attempting to use the Digital Platform to buy Defendant's goods and services. Still, Plaintiff intends to attempt to access the Digital Platform in the future to purchase the products and services the Digital Platform offers, and/or to test the Digital Platform for compliance with the ADA.

28. If the Digital Platform was accessible, *i.e.* if Defendant removed the access barriers, Plaintiff could independently research and purchase Defendant's products and access its other online content and services.

29. The law requires that Defendant reasonably accommodate Plaintiff's disabilities by removing these existing access barriers. Removal of the barriers identified above is readily achievable and may be carried out without much difficulty or expense.

30. Plaintiff has been, and in the absence of an injunction will continue to be, injured by Defendant's failure to provide its online content and services in a manner that is compatible with screen-reader technology.

## SUBSTANTIVE VIOLATIONS

### COUNT I

### Title III of the ADA, 42 U.S.C. § 12181 *et seq*.

31. The assertions contained in the previous paragraphs are incorporated by reference.

32. Title III of the ADA guarantees that individuals with disabilities shall have full and equal enjoyment of the products, services, facilities, privileges, advantages, or accommodations of any place of public accommodation.

33. Defendant is bound by the regulations implementing Title III of the ADA, which require that places of public accommodation ensure effective communication to individuals with disabilities. 28 C.F.R. § 303(c). *See also* DOJ Guidance (stating "[s]ince 1996, the Department of Justice has consistently taken the position that the ADA applies to web content.")

34. Mr. Bradley is legally blind and therefore an individual with a disability under the ADA.

35. Defendant's Digital Platform is a place of public accommodation under the ADA because it is a "sales or rental establishment" and/or "other service establishment." 42 U.S.C. § 12181(7)(E), (F).

36. Title III of the ADA guarantees that individuals with disabilities shall have full and equal enjoyment of the products, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. 42 U.S.C. § 12182; 28 C.F.R. §36.201.

37. Defendant owns, operates, or maintains the Digital Platform.

38. The Digital Platform is a service, facility, privilege, advantage, or accommodation of Defendant.

39. Title III of the ADA guarantees that individuals with disabilities shall have full and equal enjoyment of the products, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. *See also* DOJ Guidance (explaining "[b]usinesses open to the public must take steps to provide appropriate communication aids and services (often called "auxiliary aids and services") where necessary to make sure they effectively communicate with individuals with disabilities.")

40. Specifically, "[e]ven though businesses and state and local governments have flexibility in how they comply with the ADA's general requirements of nondiscrimination and effective communication, they still must ensure that the programs, services, and goods that they provide to the public—including those provided online—are accessible to people with disabilities." DOJ Guidance.

## PRAYER FOR DECLARATORY JUDGMENT AND PROSPECTIVE INJUNCTIVE RELIEF

WHEREFORE, Plaintiff prays for:

(A) A Declaratory Judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably calculated to ensure that its Digital Platform was fully accessible to, and independently usable by, individuals with visual disabilities;

(B) A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to bring its Digital Platform into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that

14

its Digital Platform is fully accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with the law, including the specific prospective injunctive relief described more fully in paragraph 17 above.

(C)   Payment of costs of suit;

(D)   Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment (*see Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, Case No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191) ("Plaintiffs, as the prevailing party, may file a fee petition before the Court surrenders jurisdiction. Pursuant to *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987), the fee petition may include costs to monitor Defendant's compliance with the permanent injunction."); *see also Access Now, Inc. v. LAX World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11) (same);

(E)   Payment of nominal damages;

(F)   The provision of whatever other relief the Court deems just, equitable and appropriate; and

(G)   An Order retaining jurisdiction over this case until Defendant has complied with the Court's Orders in regard to the specific prospective injunctive relief described at paragraph 17 above.

Dated: May 28, 2024                    Respectfully Submitted,

*/s/ Benjamin J. Sweet*
Benjamin J. Sweet
ben@nshmlaw.com

**NYE, STIRLING, HALE, MILLER & SWEET, LLP**
1145 Bower Hill Road, Suite 104
Pittsburgh, Pennsylvania 15243
Phone: (412) 857-5350

Jonathan D. Miller
jonathan@nshmlaw.com
**NYE, STIRLING, HALE, MILLER & SWEET, LLP**
33 W. Mission Street, Suite 201
Santa Barbara, California 93101
Phone: (805) 963-2345

*Attorneys for Plaintiff Roosevelt Bradley*